**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-81612-CV-HURLEY/HOPKINS**

**JONATHAN E. PERLMAN,**
     **Plaintiff,**

**vs.**

**WELLS FARGO BANK, N.A.,**
     **Defendant.**

_____/

**ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS**
**AND DENYING DEFENDANT'S MOTION TO STRIKE**

    **THIS CAUSE** is before the Court upon Defendant's Motion to Dismiss Amended Complaint and/or Motion to Strike Immaterial, Impertinent, and Scandalous Matter [DE # 23]. For the reasons to follow, the Court will grant in part and deny in part Defendant's motion to dismiss, and deny Defendant's motion to strike.

**I.**

    Plaintiff, Jonathan Perlman, is the court-appointed receiver for a number of related entities[1] (the "receivership entities") created and used by George Theodule to perpetrate a so-called Ponzi scheme. Theodule targeted the Haitian-American community promising unrealistic returns and succeeded in misappropriating more than $68 million prior to intervention by the Securities and Exchange Commission in December of 2008. To avoid clouding the issues to be resolved in the instant litigation, greater detail regarding the underlying scheme will be presented only as necessary. Because this order addresses a motion to dismiss, the facts are stated under the assumption that the factual allegations in

---

[1] The entities include Creative Capital Consortium, LLC; A Creative Capital Concept$, LLC; United Investment Club; Reverse Auto Loan, LLC; Wealth Builders Circle, LLC; the Dream Makers Capital Investment, LLC; G$ Trade Financial, Inc.; and Unity Entertainment Group, Inc.

the Amended Complaint are true.

Theodule obtained services from a variety of financial institutions as part of his scheme.  This litigation centers around his relationship Wachovia Bank, N.A.[2]  Theodule had previously banked at Washington Mutual but was advised that his account would be closed due to suspicious activity.  Theodule then moved to Wachovia.  At Wachovia ("the Bank"), Theodule started by opening four accounts for Creative Capital Consortium, LLC, which were initially classified as relating to a "money service business" and later reclassified as relating to "investment business" and "securities/commodities" business activity.  During the five weeks following the initial meeting, a variety of "feeder accounts" were opened by other individuals, including Theodule's wife and sister.  These "feeder accounts" transferred $2.2. million directly to the Creative Capital accounts in the first month.

Within six weeks after Theodule opened the Creative Capital accounts, the Bank noted in internal documents that an investment club account belonging to Wealth Builders Circle, LLC suspiciously deposited numerous small-dollar, even-amount checks from individuals totaling $400,000, which was then transferred directly to the Creative Capital accounts.  In response, the Bank froze the Creative Capital Accounts but then removed the freeze four days later when a Creative Capital employee provided a "Creative Capital Consortium Business Plan."  Plaintiff alleges that the business plan was "nonsensical" on its face, for example, by stating an intention to target "accredited investors" despite the fact that the influx of money into the accounts came from small investors and investment clubs and despite a statement on the Wealth Builders Circle website that investment clubs are suitable for novice investors.  From May 9, 2008 to July 31, 2008, $10,067,443.51 were deposited into the Creative Capital

_____

[2]  Subsequently, Wells Fargo Bank, N.A. ("Wells Fargo") acquired Wachovia such that Wells Fargo is Wachovia's successor-in-interest.  For simplicity, the Court will simply refer to Defendant as "the Bank" in the text of this order except when the context requires greater specificity.

accounts and $10,560,239.93 were withdrawn with substantial portions going directly to Theodule and his wife.

On July 24, 2008, the Bank informed Theodule's wife, Dorothy Delisfort, that it was closing the Wealth Builder's Circle, LLC account because there was "no evidence of any investing going on" and "funds were merely washing through the account from hand to hand." Then on August 1, 2008, the Bank closed most of the Creative Capital accounts. Over the course of the five-month relationship, Theodule transferred more than $38 million through the Wachovia accounts, including over $1 million in over-the-counter cash transactions.

In light of this activity, Plaintiff, as receiver for the entities used to perpetrate the scheme, filed a complaint against the Bank for its alleged role in the scheme and the resulting harm to the entities. Importantly, the Receiver does not assert claims for harms inflicted on the investors in the scheme. Rather, the Receiver asserts claims only for harms inflicted on the entities themselves when Theodule and others misappropriated the funds that had been deposited in the entities. Specifically, the Amended Complaint contains counts based on aiding and abetting breach of a fiduciary duty, aiding and abetting conversion, common law negligence, wire transfer liability under federal and state law, avoidance of fraudulent transfers, and aiding and abetting of fraudulent transfers.

The Bank responded with the instant motion to dismiss. Regarding all of the claims, the Bank argues that the Receiver has no standing, that any damages are illusory by virtue of the entities' nature as instrumentalities of the fraud, and that the Receiver's claims are barred by the doctrine of *in pari delicto*. The Bank also points out that to the extent the Receiver seeks to impose liability for violations of the Bank Secrecy Act, 31 U.S.C. §§ 5311, *et seq.*, such claims fail because the Bank Secrecy Act creates no private cause of action. With respect to the individual claims, the Bank challenges the aiding and abetting claims on the basis that the Receiver has insufficiently alleged actual knowledge and

substantial assistance.  The Bank also argues that aiding and abetting breach of a fiduciary duty is precluded when, as in the instant case, no honest person existed within the entities to whom the breach could be reported.  As to the aiding and abetting conversion claim, the Bank argues that there can be no conversion by Theodule of assets of the entities that were themselves converted from investors.  The Bank challenges the negligence claim because it was under no duty to the entities and because the claim is barred by the economic loss rule.  Finally, the Bank also challenges the remaining individual claims on bases that will be addressed herein.

## II.

As a preliminary matter, this Court has jurisdiction pursuant to 28 U.S.C. §§ 754, 1367, and 1692.  Venue is proper because a substantial portion of the events underlying this action took place in the Southern District of Florida.  Pursuant to the receivership order this court entered in *Securities and Exchange Commission v. Creative Capital Consortium, LLC*, the Receiver is authorized and has standing to assert all legal and equitable claims available to the receivership entities prior to the institution of the SEC receivership action.  As part of its assessment of jurisdiction, however, and before addressing the substantive elements of the claims, the Court must determine whether the Receiver has standing to assert the claims presented in the Amended Complaint.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (finding that standing implicates a federal court's authority to hear a case and must therefore be addressed as a threshold matter).

## A.

The first aspect of standing the Court must evaluate is "constitutional standing," which requires (1) a cognizable injury suffered by the plaintiff that is (2) fairly traceable to the defendant's conduct and is (3) redressable by a court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Based on this conception of standing, it is clear that the Receiver does not have standing to assert claims held by

the actual investors in the Ponzi scheme. *See, e.g.*, *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1202 (11th Cir. 2003); *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 553 (Fla. Dist. Ct. App. 2003). "Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity in receivership." *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995). The torts that occurred when Theodule and others solicited investments are not "injur[ies] suffered by the plaintiff" in this case. Therefore, to the extent the Amended Complaint asserts claims based on these torts, such claims must be dismissed for lack of standing. The same cannot be said, however, for claims based on the torts that occurred when Theodule and others embezzled the funds deposited into the receivership entities. These "embezzlement torts" have been found cognizable injuries suffered by entities by other courts in similar circumstances. *See, e.g.*, *First Union*, 350 F.3d at 1203-04; *Scholes*, 56 F.3d at 754. The entities "received money from unsuspecting, if perhaps greedy and foolish, investors [that] should have been used for the [entities'] stated purpose." *Id.* at 754. Thus, when Theodule embezzled the money, he "removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations." *Id.*

The Bank challenges the application of this principle to the instant case, however, by arguing that since the receivership entities were merely Theodule's alter egos, they were not, in fact, injured by his embezzlement. Def.'s Reply Supp. Mot. Dismiss Am. Compl. at 2 ("[A] company that has no legitimate business operations and exists merely as a vehicle to perpetuate a Ponzi scheme[] cannot be harmed and lacks standing."). This position finds some support in *First Union*, in which the court, in dicta, observed that if the entity "were merely the alter ego of Payne, [the schemer/embezzler,] we might agree with the district court that there was also no standing for the embezzlement count. Payne could not embezzle funds from himself." 350 F.3d at 1204. The court added that "[a]s long as [the entity] was not merely Payne's alter ego, it is conceivable that Payne could have wrongfully embezzled money from

the organization." *Id.* However, other courts have reached a different conclusion. *See, e.g.*, *Scholes*, 56 F.3d at 754. In *Scholes*, the court addressed specifically an equity receiver's standing in a case involving corporations that seemed to be in every sense the alter egos of the embezzler:

> How, the defendants ask rhetorically, could the allegedly fraudulent conveyances have hurt Douglas, who engineered them, or the corporations that he had created, that he totally controlled and probably . . . owned all the common stock of, and that *were merely the instruments through which he operated the Ponzi scheme*? The answer . . . turns out to be straightforward. The corporations, as Douglas' robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties.

*Id.* (emphasis added). The court went on to find that, despite their "deep, their utter, complicity in [the] fraud," the entities were "entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes" once they had been "[f]reed from his spell" by the appointment of a receiver. *Id.* The Court finds this reasoning persuasive. Although the aforementioned dicta from the Eleventh Circuit suggests that it "might" find differently when, as in the instant case, there was indeed an "identity of interests" between the receivership entities and the embezzler, *First Union*, 350 F.3d at 1204, a contemporaneous opinion by Judge Cudahy, who authored the *First Union* opinion, elaborates and seems to depart from this thinking. *See generally Knauer v. Jonathon Roberts Fin. Grp., Inc.* 348 F.3d 230 (7th Cir. 2003) (Cudahy, J.). In *Knauer*, Judge Cudahy found that a receiver for entities called Heartland and JMS had standing despite an allegation in the receiver's complaint that "[s]imply put, [the embezzlers] *were* heartland and JMS." While noting that "the Ponzi fraud pervaded the entire entity at all relevant times," *id.* at 234 n.4, Judge Cudahy nevertheless held that "the diversion of funds [by the embezzlers] from Heartland and JMS did arguably constitute injuries to the Ponzi entities, giving [the receiver] standing . . . ." *Id.* at 234. Taking these cases together, the Court interprets the statement in *First Union* less as the pronouncement of a legal rule and more as an alternate basis for departing from the reasoning in *Freeman*, which the court was in the process of analyzing and distinguishing. Based

6

on the foregoing, the Court will not extend indefinite dicta in *First Union* as the Bank requests.  Instead, the Court adopts the reasoning in *Scholes* and finds that the receivership entities did suffer an injury for the purposes of the constitutional standing inquiry when Theodule and others embezzled from them.[3]

### B.

Next, the Court must evaluate certain prudential considerations that have been incorporated into the standing doctrine.  Included in these considerations is the question "whether the plaintiff is asserting his own legal rights and interests rather than the legal rights and interests of third parties."  *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987).  For the sake of conceptual clarity, this consideration should not be confused with the procedural requirement that an action be prosecuted by the real party in interest under Federal Rule of Civil Procedure 17(a).  *See, e.g.*, *Rawoof v. Texor Petrol. Co., Inc.*, 521 F.3d 750, 756-57 (7th Cir. 2008).  *See also* 13A Wright, Miller & Cooper, *Federal Practice and Procedure* §§ 1527 n.18, 3531 (3d ed. 2008) (noting that "[c]onfusions of standing with real-party-in-interest doctrine occur with some frequency").  However, many courts have noted the common strand running through both doctrines, and some have treated Rule 17(a) as a codification of the prudential standing limitation precluding a plaintiff from asserting the rights and interests of third parties.  *See, e.g.*, *Rawoof*, 521 F.3d at 757; *RMA Ventures Cal. v. SunAmerica Life Ins. Co.*, 576 F.3d 1070, 1073 (10th Cir. 2009).  Indeed, the Bank's argument that the Court should dismiss Plaintiff's claims based on prudential standing considerations is couched in "real-party-in-interest" language.  Def.'s Reply Resp. Mot. Dismiss Am. Compl., at 6 [DE # 44] ("The *real parties in interest* are already

---

[3] In making this finding, the Court also rejects the reasoning in *Freeman* to the extent it can be read to indicate a lack of standing in these circumstances.  865 So. 2d 543.  The analysis in *Freeman* is more appropriate to address the doctrine of *in pari delicto* than the threshold standing requirements.  *Compare id.* at 551 at 552 *with Knauer*, 348 F.3d at 236-38.  The Court discusses these issues in Part III.A. *infra*.

pursuing their own claims . . . ." "The basic purpose of rules requiring that every action be prosecuted by or on behalf of the *real party in interest* is . . . ." (emphasis added, capitalization and typeface adjusted)).

Rule 17(a) is "a procedural rule requiring that the complaint be brought in the name of the party to whom the claim 'belongs' or the party who[,] 'according to the governing substantive law, is entitled to enforce the right.'" *Rawoof*, 521 F.3d at 756 (internal citations omitted).  While it is clear that the Receiver is entitled to enforce rights held by the entities, to the extent that Rule 17(a) is meant to "protect[] a defendant against a subsequent claim for the same debt underlying a previously entered judgment," the Bank's concern is well founded.  *Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315 (D.C. Cir. 2000).  The Bank also faces a class-action lawsuit by the investors in the Ponzi scheme,[4] and indeed any recovery procured by the Receiver in this lawsuit would flow, at least in part, to these investors.  The Bank's objection also incorporates elements of Rule 19, which requires mandatory joinder of necessary parties.  *See, e.g.*, *Hammond v. Clayton*, 83 F.3d 191, 195 (7th Cir. 1996) ("Rule 19 is designed to protect the interests of absent persons, as well as those already before the court, from duplicative litigation, inconsistent judicial determinations, or other practical impairment of their legal interests.").

While the Court is not persuaded that it must dismiss the case on prudential grounds—which the Court notes do not carry the same weight and are not as absolute as the Article III limits on standing discussed above—the Court is nevertheless concerned about persisting issues relating to duplicative

---

[4] *Horace-Manasse v. Wells Fargo Bank, N.A.*, No. 0:10-cv-81623-WJZ.  Additionally, Plaintiff has asserted claims similar to those in the instant action against another financial institution.  *Perlman v. Bank of America, N.A.*, No. 9:11-cv-80831-DTKH.  It is unclear at this stage to what extent the claims overlap or involve identical funds.

litigation and the potential for inconsistent verdicts.  Other courts facing similar circumstances have only obliquely addressed the concerns presented by the instant case.  In *First Union*, for example, the court noted without explicating a discrete rule that, "[w]here . . the trustee is litigating in concert with investors . . . we find the concern that the trustee is somehow displacing the rights of the investors to be misplaced."  350 F.3d at 1203.  Similarly, in *Scholes*, another case in which a trustee attempted to recover for entities invovled in a Ponzi scheme, the court evaluated alternative approaches to obtaining recoveries for the benefit of corporate creditors (including the Ponzi scheme investors) and noted that it "appears no debtors or creditors connected with Douglas's enterprise prefer the bankruptcy route to the receivership route."  56 F.3d at 755.  The court also discussed individual suits by the investors or a class action, concluding that neither were preferable to the trustee's suit per se.  *Id.*  In the instant case, by contrast, the investors and the trustee are not "litigating in concert" to the same extent as in *First Union* (in which both the trutee and a class of investors were named plaintiffs), and at least one investor has elected an alternative approach to the trustee's instant action.

In *Caplin v. Marine Midland Grace Trust Co. of New York*, the Supreme Court cautioned against trustees supplanting "the persons truly affected."  406 U.S. 416, 434 (1972).  Unlike the constitutional standing requirements addressed in Part II.A. *supra*, these prudential concerns are not necessarily threshold determinations. Therefore, the Court will withhold a determination of how best to handle these concerns until after the pleading stage, to the extent that any of the related actions proceed that far.

### III.

The Court will now address the Bank's substantive challenges to the Complaint.  Granting a motion to dismiss is appropriate when a complaint contains simply "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  To survive a motion to dismiss, a complaint must contain factual allegations that "raise a reasonable expectation that

discovery will reveal evidence" in support of the claim and that plausibly suggest relief is appropriate. *Id.* On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir. 1986). The threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim upon which relief can be granted. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir. 1985). Regardless of the alleged facts, a court may dismiss a complaint on a dispositive issue of law. *See, e.g.*, *Marshall County Bd. Of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir. 1993).

### A.

The Bank also argues the Amended Complaint should be dismissed based on the doctrine of *in pari delicto*. "The equitable defense of *in pari delicto*, which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). As this Court has previously held, *see Perlman v. Alexis*, No. 09-20865, 2009 WL 3161830, *2 (S.D. Fla. Sept. 25, 2009), *in pari delicto* is an affirmative defense requiring the defendant to prove facts independent of the elements of the plaintiff's cause of action. *See, e.g.*, *Knauer*, 348 F.3d at 237 n.6 (7th Cir. 2003) ("*[I]n pari delicto* is an affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal."); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 346 (3d Cir. 2001) ("An analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*."); *Court-Appointed Receiver of Lancer Mgmt. Grp. LLC v. Lauer*, No. 05-60584, 2010 WL 1372442, *3 (S.D. Fla. Mar. 31, 2010). Therefore, to prevail on an *in pari delicto* defense at the pleading stage, the Bank must show that the factual basis of the defense is "definitively ascertainable from the complaint and other allowable sources." *Gray v. Evercore Restructuring, LLC*, 544 F.3d 320, 325 (1st Cir. 2008). The Bank

Generally speaking, "a receiver takes the rights, causes, and remedies which were in the individual or estate whose receiver he is, or which were available to those whose interests he was appointed to represent." 75 C.J.S. *Receivers* § 409. Thus, Plaintiff may assert claims held by the receivership entities, and the Bank, subject to some exceptions, may assert defenses to those defenses that it would have been able to assert had the receivership entities brought them, including the defense of *in pari delicto*.[5] When "the defense of *in pari delicto* is asserted against a corporate entity based on the misconduct of the corporation's agents, [the court must] determine[] whether the misconduct of those agents is properly imputed to the corporation." *In re Mirabilis Ventures, Inc.*, No. 6:09-cv-271-Orl-31DAB, 2011 WL 397788, *3 (M.D. Fla. Feb. 1, 201l) (citing *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044 (Fla. Dist. Ct. App. 2007)). With respect to Plaintiff's claims brought under Florida law, the Court will adhere to Florida's approach to determining whether to impute misconduct. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 84-85 (1994).

Under Florida law, the general rule that the misconduct of a corporation's agent is imputed to the corporation itself is subject to the *adverse interest exception*. *Mirabilis*, 2011 WL 397788, at *3. Under the adverse interest exception, misconduct is not imputed to a corporation if the misconduct was adverse to the corporation's interests. *Id.* However, the adverse interest exception does not apply if "the corporate actors whose conduct is at issue were the 'alter egos' of the corporation—[i.e.,] the corporation was wholly dominated by persons engaged in wrongdoing." *Id.* "[T]he presence of any innocent decision-maker in the management of a corporation" renders the adverse interest exception applicable and defeats an *in pari delicto* defense. *Id.*

---

[5] As discussed below, the *in pari delicto* defense may be susceptible to an exception to the general rule that defenses that would have been viable against the receivership entities are equally viable against the receiver. *See, e.g.*, *Scholes*, 56 F.3d at 754.

Applying these principles to the instant case, the Bank draws the Court's attention to the paragraphs six and fourteen of the Amended Complaint, which state as follows:

> 6.  At all times material hereto, George Theodule ("Theodule") was an officer, director, managing agent, principal, and/or control person of each of the Receivership Entities. Theodule is a named defendant in the SEC Receivership Action.
>
> [. . .]
>
> 14.  Subsequent to his appointment, the Receiver determined that the Receivership Entities had no legitimate business operations.  The Receiver also determined that so-called "profit" payments initially made to investors by the Receivership Entities, in fact, came from money raised from other investors, confirming that the Receivership Entities operated as nothing more than a classic Ponzi scheme.

While these allegations indicate a strong possibility that there was no "innocent decision-maker in the management" of any of the receivership entities, the Court cannot say that they "suffice to establish the affirmative defense with certitude," as would be necessary to dismiss the complaint on the basis of this defense at the pleading stage.  *Gray*, 544 F.3d 320.  Under similar circumstances in an ancillary case, the Court noted that the Receiver's allegations rightly focus on the conduct of the Bank and not the precise nature of each of the receivership entities.  *Alexis*, 2009 WL 3161830 at *3.  Additionally, the Court found a disputed issue as to whether "other, innocent managers of the Receivership Entities" existed so as to preclude the *in pari delicto* defense and therefore declined to apply it at the pleading stage.  *Id.*

Going further, even if it were apparent from the pleadings that the *in pari delicto* defense would have applied to bar Plaintiff's claims had they been asserted by the receivership entities themselves,  the Court is unclear as to whether, under Florida law, the appointment of a receiver causes the *in pari delicto* defense to "lose[] its sting."[6]  *Scholes*, 56 F.3d at 754.  The appointment of a receiver might have this

_____

[6]  The Court notes that *Mirabilis* did not involve an equity receiver or bankruptcy trustee.  2011 WL 397788, at *1.

effect because, "[a]lthough a receiver receives his or her claims from the entities in receivership, a receiver does not always inherit the sins of his or her predecessors."  44 Fla. Jur. 2d *Receivers* § 84. While *Freeman* may be read to suggest essentially a recapitulation of the adverse interest exception described above—that is, a receiver "cleanses" a corporation that, through its agents, may have been *in pari delicto* with the defendants only if the corporation "has at least one honest member of the board of directors or an innocent stockholder,"—certain elements of *Freeman* leave the Court unpersuaded that this approach can be applied to the instant case.  865 So.2d at 551.  First is the *Freeman* court's statement it was "inclined to believe that the receiver may also pursue certain claims that would be barred by the defense of *in pari delicto* if pursued by the corporation that was placed in receivership," *id.* at 550, in combination with the statement that the receiver's "ability to pursue the remaining counts is not affected so much by the doctrine of *in pari delicto* as it is by the factual history of this Ponzi scheme." *Id.*  In light of these statements, it is unclear to what extent the *Freeman* opinion was based on the *in pari delicto* doctrine currently under scrutiny.  Moreover, the court goes on to quote *First Union* for the proposition that "the corporation, 'whose primary existence was a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme in perpetrated.'" *Id.* at 552 (quoting *First Union*, 350 F.3d at 1203).  This seems less an application of *in pari delicto* as a basis for finding the absence of standing or the absence of the damages element of various causes of action that may have been asserted.

Owing to the equitable origins of the doctrine of *in pari delicto*, other courts to address application of the *in pari delicto* doctrine against receivers or trustees have applied a different, more flexible approach.  In *Knauer*, for example, the Seventh Circuit distinguished between its case and *Scholes*, observing that, unlike in *Scholes*, the receiver in *Knauer* sought damages against "entities that derived no benefit from the embezzlement" and whose only culpability arose "from the employment or

agency relationship" between the defendants and the primary violators.  348 F.3d at 237.  *See also*

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1154 (11th Cir. 2006)

(employing a factual inquiry as part of the analysis of how to apply the *in pari delicto* doctrine to causes

of action created by federal statutes).  The court went on to note that the plaintiff entities had similar

employment and agency relationships with the primary violators, that the defendants' role in the Ponzi

scheme as a whole was "quite minor," and that there was "no allegation whatsoever that the defendants

were directly involved in the embezzlements or benefitted from them."  *Id.*  On these bases the court

concluded that the plaintiffs were "charged with fault at least equal" to that of the defendants, and that

the *in pari delicto* doctrine applied.  The *Knauer* court contrasted its case with *Scholes*, in which the

defendants were recipients of fraudulent transactions.  *Id.* at 237-38.

The instant case represents a scenario intermediate between *Knauer* and *Scholes*.  While the

Bank did not benefit as directly from Theodule's embezzlements as the defendants in *Scholes* benefitted

from fraudulent transfers in their favor, it also was not as disinterested as the defendants in *Knauer*

because it presumably did receive the benefit of the fees for its financial services in administering

Theodule's numerous transactions and accounts.  Because the Bank cannot make out the affirmative

defense of *in pari delicto* at the pleading stage for reasons discussed above, the Court will not pursue

the fact-sensitive inquiry into whether the receivership defeats an *in pari delicto* defense under the

circumstances of this case.  Rather, the Court merely notes that under Florida law, "a receiver does not

always inherit the sins of his or her predecessors."  44 Fla. Jur. 2d *Receivers* § 84.  This is an additional

reason not to dismiss Plaintiff's claim based on *in pari delicto* at this stage.

**B.**

The Bank next challenges the sufficiency of the Receiver's allegations supporting its claims for

various forms of aiding and abetting liability.[7]  The *Second Restatement of Torts* sets forth the general requirements for aiding and abetting liability: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  § 876 (1979).  To summarize, aiding and abetting liability requires (1) a primary violation, (2) actual knowledge of the violation by the aider, and (3) substantial assistance given by the aider to the primary violator in furtherance of the violation.  *See also Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985) (To state a claim for aiding and abetting, the plaintiff must allege that "'the accused party ha[d] a general awareness that his role was a part of an overall activity that is improper [and that] the accused aider-abettor knowingly and substantially assisted the violation.'" (quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94-95 (5th Cir. 1975))); David S. Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy,* in Pari Delicto*, Indemnification, and Contribution*, 120 U. Pa. L. Rev. 597, 620-22 (1972).

Setting aside for the moment the first element—i.e., a primary violation in the form of a breach of fiduciary duty, conversion, or fraudulent transfer—the Bank argues that the Receiver has not sufficiently pleaded either the knowledge or substantial assistance elements.  Addressing first substantial assistance, the Court finds that the Receiver's allegations regarding the banking services the Bank provided meet this burden.  Having been cast off from his initial banking relationship, Theodule depended on the procurement of another banker to effect the embezzlement transactions constituting the breach of fiduciary duty, conversion, or fraudulent transfer.  While there is some disagreement as to whether routine banking services can ever qualify as substantial assistance, the Court finds that the

---

[7]  Specifically, the Receiver asserts claims based on aiding and abetting breach of a fiduciary duty, aiding and abetting conversion, and aiding and abetting fraudulent transfers.

relative ordinariness of a transaction has no bearing on whether the transaction was of substantial assistance in perpetrating wrongful conduct. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 955 (9th Cir. 2006) ("'"[O]rdinary business transactions" a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort. Knowledge is the crucial element.'" (quoting *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 406 (Cal. Ct. App. 2005))); *cf. Fremont Reorganizing Corp. v. Duke*, No. 10-11923, 2011 WL 4357637, at *18 (E.D. Mich. Sept. 12, 2011). Therefore, to the extent the Bank disputes the substantial assistance prong, what it really disputes is whether the assistance was *knowing. See Lawrence v. Bank of America, N.A.*, No. 8:09-cv-2162-T-33TGW, 2010 WL 3467501, *5 (M.D. Fla. Aug. 30, 2010) ("These allegations do not adequately allege that [the defendant] affirmatively assisted, concealed, or otherwise *knowingly* rendered substantial assistance . . . ." (emphasis added)).

Turning to the knowledge requirement, the Court is mindful of Professor Ruder's caution, which Judge Goldberg incorporated into his opinion in *Woodward*:

> If all that is required in order to impose liability for aiding and abetting is that illegal activity under the securities laws exists and that a secondary defendant, such as a bank, gave aid to that illegal activity, the act of loaning funds to the market manipulator would clearly fall within that category and would expose the bank to liability for aiding and abetting. Imposition of such liability upon banks would virtually make them insurers regarding the conduct of insiders to whom they loan money. If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases.

Ruder, U. Pa. L. Rev. at 630-31. Thus, the knowledge element is really the crux of aiding and abetting liability, and courts have understandably devoted significant attention to the degree of knowledge required for various aiding and abetting claims, undoubtedly bearing in mind the competing interests of

16

redressing culpable conduct and avoiding undue burdens on legitimate commercial activity.   In attempting to traverse the considerable and elaborate framework courts have established to determine the standard of knowledge to apply, the Court first notes that the inquiry is potentially very fact sensitive and that "the surrounding circumstances and expectations of the parties [are] critical." *Woods*, 765 F.2d at 1009.  This is because "knowledge of the existence of a violation must usually be inferred." *Id.*  The Court next observes that "the exactly level [of knowledge] necessary for liability remains flexible and must be decided on a case-by-case basis." *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991).

As a first step, the Court must evaluate whether the alleged assistance was affirmative or passive. Courts have held that when seeking to impose liability for silence or inaction, the level of knowledge required is at a maximum unless the alleged aider and abettor was under a duty to disclose or some comparable duty to act. *Woodward*, 522 F.2d at 97.  "When it is impossible to find any duty of disclosure, an alleged aider-abetter should be found liable [for passive assistance] only if scienter of the high 'conscious intent' variety can be proved." *Id.* (footnote omitted).  A different standard applies when *affirmative* assistance is involved.  "In a case combining silence/inaction with affirmative assistance, the degree of knowledge should depend on how ordinary the assisting activity is in the business involved." *Id. See also Woods*, 765 F.2d at 1009-10 ("[S]tronger evidence of complicity would be required for the alleged aider and abettor who conducts what appears to be a transaction in the ordinary course of his business.").  Courts have characterized ordinary course transactions as those involving the "daily grist of the mill." *Woodward*, 522 F.2d at 97.  These require "clear proof of intent to violate." *Id.*  Alternatively, "if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability." *Id.*  Importantly, a court may not rely on conclusory allegations that activities were suspicious or atypical but must make such a determination based on factual allegations. *See, e.g., Lawrence*, 2010 WL 3467501 at *3-4; *Das*

17

*v. Bank of America, N.A.*, 112 Cal. Rptr. 3d 439, 451 (Cal. Ct. App. 2010) ("Although the complaints allege—without any supporting facts or details—that respondent's loan was 'suspicious,' nothing in the complaints suggests that respondent acted outside 'the scope of its conventional role as a mere lender of money . . . .'" (citation omitted)).

In the instant case, the Receiver alleges affirmative assistance and argues that the Court can infer the Bank's knowledge by the following "atypical" transactions:

- in a five-month span, numerous transfers into the receivership entities' "Securities/Commodities" accounts from individual investors and investment accounts in combination with subsequent transfers to third parties unrelated to investing in excess of $38 million;

- in a five-month span, transfers to Theodule's personal accounts in excess of $40 million; and

- failure to report transactions as required by various regulations.[8]

The Receiver also makes other factual allegations that provide circumstantial evidence of the Bank's knowledge—specifically, the coincidence of the multiple accounts and frequent transfers between them, the Bank's knowledge of Theodule's self-professed status as an "investment advisor" and the incoherent nature of his business model, and Theodule's statements regarding his decision to leave his prior banker.

---

[8] Importantly, potential violations of, for example, the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, are not themselves important to this consideration. Rather, it is the atypical nature of such violations in the Bank's business that the Court considers in determining whether it knew of the underlying violations (breach of fiduciary duty, conversion, fraudulent transfer). Compare these facts to those in *Lauer*, in which the court inferred knowledge based on the defendants' failure to adhere to the "standards of care articulated in the Uniform Standards of Professional Appraisal Practice . . . and the National Association of Certified Valuation Analysts [] guidelines." *Court-Appointed Receiver of Lancer Mgmt. Grp. LLC v. Lauer*, No. 05-60584, 2010 WL 1372442, *3 (S.D. Fla. Mar. 31, 2010). The issue was not whether the violations themselves were actionable but rather whether those violations justified an inference of the knowledge required for an aiding and abetting action.

18

In addition to all of this, the fact that the Bank's own investigation led it to be uncomfortable with its association with Theodule and conclude that the accounts needed to be terminated indicated that it possessed sufficient evidence to deduce the underlying violations at some point. However, this fact also supports the argument that the Bank did not know of the underlying violations because, once it did, it terminated the accounts.

In light of these allegations, the Court cannot say that there is no factual support for the knowledge element of the Receiver's aiding and abetting claims. The atypical transactions the Receiver alleged lessen the burden to plead actual knowledge and themselves can support an inference of knowledge. *Woodward*, 522 F.2d at 97. While some courts have disregarded allegations of atypical transactions as mere "conclusory allegations," *see e.g.*, *Rosner v. Bank of China*, 349 Fed. Appx. 637, 639 (2d Cir. 2009); *Lawrence*, 2010 WL 3467501 at *4, the Court finds that the atypical transactions in the instant case are sufficiently based on factual allegations to withstand the Bank's motion. *See Lauer*, 2010 WL 1372442 at *3; *Smith v. First Union National Bank*, No. 00-4485-CIV., 2002 WL 31056104, *4 (S.D. Fla. Aug. 23, 2002).

### C.

The Bank also challenges the aiding and abetting claims individually.

### 1.    *Aiding and Abetting Breach of Fiduciary Duty*

As to the claim for aiding and abetting breach of fiduciary duty, the Bank argues, in addition to its arguments discussed above, that it cannot be liable for this claim because there was no honest person within any of the entities to whom any breach of a fiduciary duty could be reported, and therefore the Bank could not have taken any action against Theodule's malfeasance. However, the Bank has provided no legal formulation of aiding and abetting which incorporates an honest person requirement. To the extent that an honest person is required, the Court notes that it has already deferred a determination as

to whether such a person existed within any of the entities until the record has been more fully developed in its analysis of the *in pari delicto* doctrine. *See supra* Part III.A. To the extent that the Bank asserts an honest person requirement as a matter of practical less than legal significance, the Court finds such a concern misplaced. Even without an honest person within the receivership entities, the Bank, once it gained knowledge of Theodule's wrongful conduct (assuming, for the moment, this ever occurred), could avoid aiding and abetting that conduct by exiting the relationship and refusing to process further transactions—as, in fact, it eventually did based on its discomfort and concerns about the nature of Theodule's businesses and apparently without the benefit of any honest person. Therefore, the Court will not dismiss the Receiver's claim for aiding and abetting breach of a fiduciary duty at this time.

      2.    *Aiding and Abetting Conversion*

The Bank next argues that it cannot be liable for aiding and abetting conversion because the first requirement of the cause of action, an underlying violation is not met. In light of the "sham" nature of the entities, the Bank argues, any conversion of their assets by Thoedule is illusory. This argument mirrors the Bank's argument that the receivership entities (and, therefore, the Receiver) have no standing because the entities have suffered no harm. The reasoning in Part I.A., therefore, sufficiently explains why the Court disagrees.

While it is true that Theodule manipulated the receivership entities and used them purely as tools to perpetrate his scheme, this fact alone does not justify ignoring the distinct legal identity of the entities. Rather, courts have traditionally been willing to overlook an entity's "personhood" only when it must do so to prevent a wrongdoer from abusing the corporate form to work a fraud or accomplish some other wrongful purpose. 18 Am. Jur. 2d *Corporations* § 47 (2011). *See also United States v. Bestfoods*, 524 U.S. 51 (1998) ("[T]he corporate veil may be pierced . . . when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes . . . ."). In the instant case, all the Court

20

would accomplish by disregarding the corporate form with respect to Theodule and the receivership entities would be to facilitate his embezzlement of the funds as the second phase of his Ponzi scheme. The court in *Feltman v. Prudential Bache Securities* made the following observation, on which the Bank relies:

> All corporations are legal fictions.  In this case, however, [the entities] were simply fictitious.  The complaint alleges that FIP and FFP were sham corporations, alter egos with no corporate identity separate from [the schemer,] Henry Gherman.  As the corporations were essentially only conduits for stolen money . . . any alleged injury to the debtors is as illusory as was their corporate identity.

122 B.R. 466, 474-75 (Bankr. S.D. Fla. 1990) (footnote omitted).  This reasoning is problematic in that it is unclear what is meant by calling the corporations at issue "simply fictitious."  As the court noted, the legal fiction of a separate identity applies to every corporation, and there was no indication that the entities in *Feltman* were not properly created or otherwise not actually in existence (i.e., literally fictitious).  The court may also have been referring to the principal's use of the corporation as a "mere instrumentality," and this interpretation is supported by the court's statement that "[u]nder Florida law, the separate identity of a corporation will be disregarded on proof that it is a 'mere instrumentality' of, that is to say, it is completely dominated by, another corporation of individual, and that it is a device or sham to mislead creditors or exists for some other fraudulent purpose."  *Id.* at 474 n.8 (internal quotations omitted).

However, as discussed above, this finding on its own does not justify ignoring the corporate form.  Rather, as the case *Feltman* relied upon to establish Florida law on the subject makes clear, an additional finding that corporate form would, if recognized by the Court, be used to work an injustice is required.  *Bendix Home Sys., Inc. v. Hurston Enters., Inc.*, 566 F.2d 1039, 1041 (Fla. Dist. Ct. App. 1978) (finding no material difference between the Florida rule on when to set aside a corporate identity and the a test requiring (1) complete domination (2) used by the defendant to commit fraud or wrong (3)

that proximately caused the injury complained of).  In the instant case, the Bank does not complain that Theodule's complete domination of the receivership entities proximately caused an injury of which it now complains.  Therefore, the cases cited by the Bank do not provide a basis under Florida law  to set aside the corporate form with respect to Theodule's conversion of corporate assets.  For this reason, the conversion is not illusory, and the motion to dismiss with respect to the Receiver's claim for aiding and abetting conversion will be denied.

　　　　3.　　*Aiding and Abetting Fraudulent Transfer*

　　　　The  Receiver  brings  a  claim  against  the  Bank  for  aiding  and  abetting  fraudulent  transfers consisting of "numerous and ongoing transfers . . . among and between the Receivership Entities" and to "various third[]parties" from the Wachovia accounts.  Am. Compl. ¶¶ 107, 108 [DE # 19].  The Receiver argues that the Bank was an initial transferee and "not a conduit" because of the deposits by Theodule into the Wachovia accounts.  *Id.* at 110.  In *Freeman v. First Union National Bank*,[9] 865 So.2d 1272 (Fla. 2004), the Florida Supreme Court considered a claim for aiding and abetting fraudulent transfers against a bank that allowed an entity with its primary bank account there to transfer money to Liechtenstein even after it know the entity had engaged in illegal activities and was the subject of both a state lawsuit and an injunction related to the lawsuit.  *Id.* at 1274 n.3.  In analyzing the Florida Uniform Fraudulent Transfer Act (FUFTA) codified under chapter 726, Florida Statutes, the Court unanimously held that FUFTA's narrow focus precluded its expansion to recognize liability as an aider and abettor under the facts presented.  In the instant case, the Court sees no reason to depart from the Supreme Court's guidance.  While the Receiver has attempted to draw distinctions based on whether the Bank

---

　　　　[9]  The Court has previously referred to other cases as both *Freeman* and *First Union*.  For that reason,  the  Court  will  continue  to  refer  to  *Freeman  v.  First  Union  National  Bank*  by  its  full, unabbreviated case name.

qualifies as an "initial transferee," the similarity of the relationship between the bank and the entities in *Freeman v. First Union National Bank* and the relationship between the instant receivership entities and Wachovia obviates the need for further examination in this regard.  Accordingly, the Receiver's claim for aiding and abetting fraudulent transfer will be dismissed.

**D.**

Next, the Court will address the Receiver's claims for negligence and the Bank's argument that the claim is barred by the economic loss rule.  When the basis of the parties' relationship is contractual, the economic loss rule prohibits suit under tort theories for purely economic losses unless the plaintiff can establish some independent cause of action beyond the scope of the contract.  *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 902 (Fla. 1987).  Under Florida law, the relationship between a bank and its customers is contractual.  *MJZ Corp. v. Gulfstream First Bank & Trust, N.A.*, 420 So. 2d 396, 397 (Fla. Dist. Ct. App. 1982).  "The delivery of money to a bank implies an 'agreement on the part of the bank that the deposit will be paid out on the order of the depositor or returned to him upon demand.'"  *Id.* (internal citation omitted).  Implicit in any contract is a promise to use reasonable care and skill in performing contractual obligations.  17A C.J.S. *Contracts* § 438.  If the Receiver's negligence claim is predicated on the Bank's alleged failure to exercise this level of care and skill, the economic loss rule dictates that the appropriate cause of action is for breach of contract and not negligence.

The Receiver counters, however, that the basis of the Bank's negligence is not a breach of the ordinary level of care implied by the contractual relationship but some heightened duty to disclose that arises under "special circumstances."  The Receiver relies upon *Barnett Bank of West Florida v. Hooper* for the proposition that such special circumstances arise when a bank has actual knowledge of fraud being perpetrated against a customer and nevertheless enters into a transaction with that customer in

23

furtherance of the fraud.  498 So. 2d 923 (Fla. 1986).  However, the *Barnett* Court, mindful of its

potential impact on the banking industry, formulated its rule more precisely in the following statement:

> [W]e find that where a bank becomes involved in a transaction with a customer with
> whom it has established a relationship of trust and confidence, and it is a transaction
> from which the bank is likely to benefit at the customer's expense, the bank may be
> found to have assumed a duty to disclose facts material to the transaction, peculiarly
> within its knowledge, and not otherwise available to the customer.

*Id.* at 925.  Application of this rule to the instant facts is problematic.  It presupposes that the bank and

the customer have "established a relationship of trust and confidence," which the Receiver has not

demonstrated to be true in the instant case.  In *Barnett*, the Court determined that a jury could have

found that a "bank, having established a confidential or fiduciary relationship with [a client], entered into

a transaction with [the client] from which it was likely to benefit . . . ."  *Id.*  Only under these "special

circumstances" would a duty of disclosure emerge.  Thus, *Barnett*'s special circumstances are not the

source of a fiduciary duty but rather establish circumstances under which a fiduciary duty may blossom

into a duty to disclose that may trump an existing duty of confidentiality.[10]

Based on this reading of *Barnett*, the Court finds that the Receiver has not established that the

Bank owed any standard of care to the receivership entities beyond that implied by their contractual

relationship.  Therefore, if the Bank breached this contractual duty, the proper claim is for breach of

contract.  For this reason, the Court will dismiss the Receiver's claim for negligence.

### E.

The Court next addresses the Receiver's counts six and seven, each seeking to avoid fraudulent

transfers pursuant to FUFTA, codified at chapter 726 of the Florida Statutes.  A fraudulent transfer

---

[10]  The Court is also mindful of the fact that *Barnett* was decided prior to the Florida Supreme
Court's decision in *Florida Power & Light* adopting the economic loss rule under Florida law.  *See
Moransais v. Heathman*, 744 So. 2d 973, 980 (Fla. 1999) (referring to *Florida Power & Light* as "the
seminal case on the applicability of the economic loss rule").

involves at least three parties: a debtor, a transferee who receives something of value from the debtor, and a creditor who seeks to recover the value transferred in satisfaction of its debt. Fraudulent transfers can involve additional parties to the extent that the transferee—that is, the *initial* transferee—subsequently transfers the value it received from the debtor to additional parties. The Receiver's two counts present different conformations of the fraudulent transfer framework. In each count, the receivership entities are the debtors, the receiver is the creditor, and the Bank is an initial transferee. The difference between the two is that in count six the value transferred is the money deposited by the receivership entities into their Wachovia accounts, while in count seven the value is the money transferred from one entity's accounts to another's, the latter being a Wachovia account.

The Bank argues that as to both counts it cannot be liable because it was never the intended recipient of the transferred funds nor did it ever control them—in other words, the Bank was a mere conduit and therefore cannot be liable for recovery under FUFTA. *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)* ("*Nordberg*"), 848 F.2d 1196, 1199-1200 (11th Cir. 1988) ("[C]ourts have refused to allow trustees to recover property from defendants who simply held the property as agents or conduits for one of the real parties to the transaction."). "Although a bank can gain control of funds that are transferred to it, such as when a bank receives a transfer to pay of [sic] a debt owed to the bank, '[w]hen banks receive money for the sole purpose of depositing it into a customer's account . . . the bank never has actual control of the funds." *Supervision Int'l, Inc. v. Mega Int'l Commercial Bank Co., Ltd.*, F. Supp. 2d 1326, 1344 (S.D. Fla. 2008) (granting a motion to dismiss as to a fraudulent transfer claim based on the "mere conduit" defense). In response, the Receiver states that the mere conduit exception does not apply if the Bank cannot show that it acted in good faith and was an innocent participant in the fraudulent transfer scheme.

In reviewing Eleventh Circuit case law on this issue, Judge Hull provided the following synopsis

25

of the court's precedents:

> Taking *Chase & Sanborn*,[11] *Nordberg*, *IBT*,[12] and *Pony Express*[13] together, a clear pattern emerges.  First, this Court has observed that a literal or rigid interpretation of the statutory term "initial transferee" in § 550(a)[14] means that the first recipient of the debtor's fraudulently transferred funds is an "initial transferee."

> Second, this Court carved out an equitable exception to the literal statutory language of "initial transferee," known as the mere conduit or control test, for initial recipients who are "mere conduits" with no control over the fraudulently-transferred funds. . . .

> Third, as part of the mere conduit or control test, this Court considers whether the intermediary "acts without bad faith, and is simply an innocent participant" to the fraudulent transfer.

> Consistent with our precedent, we conclude that good faith is a requirement under this Circuit's mere conduit or control test.  Accordingly, initial recipients of the debtor's fraudulently-transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language must establish (1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control fo the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer.

*In re Harwell*, 628 F.3d 1312, 1322-23 (11th Cir. 2010) (internal citations omitted).  The Bank, however,

argues that *Harwell* is inapposite because it involved an attorney who utilized his trust client account

---

[11] *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir. 1987).

[12] *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 703 (11th Cir. 2005).

[13] *Andreini & Co. v. Pony Express Delivery Servs., Inc. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296 (11th Cir. 2006).

[14] 11 U.S.C. § 550(a).  This provision of the Bankruptcy Code is essentially equivalent to Fla. Stat. § 726.109(2).  Section 550(a)(1) provides: "Except as otherwise provided . . . the trustee may recover . . . from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made."  Section 726.109(2)(a) provides: "Except as otherwise provided . . . the creditor may recover . . . against . . . [t]he first transferee of the asset or the person for whose benefit the transfer was made."  The Court finds the cited case law construing § 550(a)(1) equally applicable to § 726.109(2)(a).

to effectuate fraudulent transfers and not a bank.  However, the case law does not support a categorical

exclusion for banks from the equitable analysis described in *Harwell* as the Bank seems to suggest.  At

most, courts have recognized that the mere conduit rule will often apply to banks and other intermediary

institutions and that the rule may take on special "special significance" in such a context.  *Id.* at 1321;

*see also, e.g.*, *IBT*, 408 F.3d at 705 ("The mere conduit rule is used most frequently in situations where

banks act as an intermediary in transferring assets."); *Pony Express*, 440 F.3d at 1300-01.  But in any

case, the mere conduit analysis as explicated in *Harwell* applies, and it requires a showing of relative

innocence.

Bearing in mind the flexible nature of the *Harwell* analysis and the special concerns associated

with treating a bank as an initial transferee, the Court finds that the essential inquiry again becomes the

degree of knowledge the Bank had of Theodule's scheme because, in an equitable analysis, the Bank's

relative culpability or involvement hinges directly on its actual knowledge that the transfers were part

of a fraudulent scheme.  The Bank clearly satisfies the first prong of the *Harwell* analysis—i.e., that it

"did not have control over the assets receiver [and] merely served as a conduit for the assets that were

under the actual control of debtor-transferor."  628 F.3d at 1323.  To take advantage of the mere conduit

rule, however, the Bank must demonstrate its innocence and good faith.  For these purposes, the Bank's

knowledge *at the time it received the transfer* is the crucial factor.

Applying this approach, the Court finds that the Receiver cannot state a fraudulent transfer claim

as to the initial account deposits made when the Bank had no basis to know or even suspect that the

funds it received were the part of any fraudulent scheme.  However, as the alleged "atypical

transactions" discussed in Part III.B. began to mount, it is plausible that the Bank acquired the requisite

knowledge to become more than just an innocent intermediary receiving transfers from the receivership

entities in good faith.  At the pleading stage, it is impossible and inappropriate to dissect exactly when

27

this knowledge may have arisen and therefore for which transfers the Receiver may be able to state a claim. It will suffice to observe that the Bank clearly satisfies the first prong of the mere conduit defense and that if it can demonstrate sufficient innocence and good faith to tip the equitable scales in its favor with respect to any transfer, such transfer will not be subject to recovery by the Receiver under FUFTA.

The Bank also argues that the fraudulent transfer claims fail because the Receiver has not established a debtor attempting to defraud a creditor, a creditor sought to be defrauded, and a conveyance of property which could have been available to the creditor to satisfy a debt but for the transfer. The Court finds that the Receiver's allegations as to the overall scheme and the transfers to the Wachovia accounts as part of the scheme are sufficient to withstand the motion to dismiss (subject to the mere conduit caveat discussed above). Therefore, the Court will deny the motion with respect to the fraudulent transfer claims.

### F.

Lastly, the Receiver asserts wire transfer liability under Article 4A of the Uniform Commercial Code, codified at Fla. Stat. § 670.101 *et seq.* and Federal Reserve Regulation J (which applies to transfers effectuated via the Federal Reserve Wire Transfer Network). The Receiver does not refer in the Complaint to specific provisions of Article 4A on which his claims are based but instead refers generally to a duty of care to its customers to "correctly, cautiously, prudently, and in good faith process" wire transfers. In response to the Bank's contention that it faces no liability under Article 4(A) so long as it processed the payment orders as directed by authorized representatives of the receivership entities, the Receiver cites *Regions Bank, v. Provident Bank, Inc.*, wherein the court observed that "[i]t could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A." 345 F.3d 1267, 1276 (11th Cir. 2003). In quoting this statement, the Receiver ignores its context. In *Regions*, the court was attempting to

determine whether Article 4A preempted certain independent state law claims, including claims addressing the alleged fraudulent activity referred to in the above quote.  The court was not indicating that Article 4A itself created liability for the fraudulent activity but rather that it did not preempt any state laws that may create such liability.  Indeed, the court expressly found that "Article 4A is *silent* with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained."  *Id.* at 1275 (emphasis added).  Given that the Receiver's claim is premised on processing of wire transfers with knowledge that the funds underlying the transfers were fraudulently obtained, *see* Am. Compl. ¶¶ 80, 91 [DE # 19], and that Article 4A is silent with respect to such a claim, the Court will dismiss these counts.  This holding is consistent with *Regions* in that in each case the plaintiff is allowed to bring non-Article 4A claims to address fraudulent activity in connection with the processing of wire transfers.

## IV.

Also pending before the Court is the Bank's motion to strike certain allegations as scandalous, immaterial, or impertinent pursuant to Federal Rule of Civil Procedure 12(f).  While the Court understands the Bank's concern that references to disputed prior bad acts may be of questionable value or unduly prejudicial, Rule 12(f) was not meant to address "[i]nappropriately hyperbolic language, ill-conceived attempts at levity, and other similar manifestations of bad judgment in drafting."  *Saylavee LLC v. Hockler*, 228 F.R.D. 425, 426 (D. Conn. 2005).  Moreover, the Court cannot say that the challenged allegations bear "no possible relation" to the instant controversy.  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970 (9th Cir. 2010); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("Usually the questions of relevance and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided.").  In any event, the Court is confident in its ability to interpret the Amended Complaint without being unduly influenced by any of the

Order Granting in Part Defendant's Motion to Dismiss and Denying Defendant's Motion to Strike
Perlman v. Wells Fargo Bank, N.A.
Case No. 10-81612-CV-HURLEY/HOPKINS

Receiver's allegations.  Therefore, the motion to strike will be denied.

**V.**

Based on the foregoing, the Court will grant the Bank's motion to dismiss with respect to counts three (negligence), four and five (wire transfer liability), and eight (aiding and abetting fraudulent transfers).  The Court will deny the Bank's motion with respect to counts one (aiding and abetting breach of fiduciary duty), two (aiding and abetting conversion), and six and seven (fraudulent transfer).  The Court will also deny the Bank's motion to strike.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1.      Wells Fargo Bank, N.A.'s motion to dismiss [DE # 23] is **GRANTED IN PART** and **DENIED IN PART**.

2.      Wells Fargo Bank, N.A.'s motion to strike [DE # 23] is **DENIED**.

**DONE** and **SIGNED** in Chambers at West Palm Beach, Fla. this 22nd  day of November, 2011.

Daniel T. K. Hurley
United States District Judge

*Copies provided to counsel of record*