UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(WEST PALM BEACH DIVISION)
CASE NO. 9:10-CV-81612
(Ancillary Pro. No. 08-81565-CIV-Hurley/Hopkins)

JONATHAN E. PERLMAN, ESQ., as court
appointed Receiver of Creative Capital
Consortium, LLC, *et al.*

      Plaintiff,

vs.

WELLS FARGO BANK, N.A., as
successor-in-interest to Wachovia Bank, N.A.,

      Defendant.
_____/

## WELLS FARGO BANK, N.A.'S MOTION TO EXCLUDE/STRIKE EXPERT TESTIMONY OF SHERRY M. BENNETT AND INCORPORATED MEMORANDUM OF LAW

Defendant, Wells Fargo Bank, N.A. ("Wells Fargo"), pursuant to S.D. Local Rule 7.1, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) and Federal Rules of Evidence 702 and 703, moves the Court for the entry of an Order excluding and/or striking the opinion testimony of plaintiff's expert Sherry M. Bennett, CPA, CIRA, CFF and in support states as follows:

### I.   INTRODUCTION

On August 18, 2014, Jonathan Perlman, Esq., as court appointed Receiver of Creative Capital Consortium, LLC, *et al.* ("Plaintiff" or "Perlman" or "Receiver"), disclosed Sherry M. Bennett, CPA, CIRA, CFF and served Wells Fargo with the Report of Expert Bennett (the "Report", attached herein as **Exhibit "A"**) in which Perlman proposes to offer Bennett's "expert" opinion testimony that: (i) The Receivership Entities[1] were insolvent during the

---

[1] The "Receivership Entities" are collectively defined herein as: (i) A Creative Capital Concept$, LLC; (ii) Creative Capital Consortium, LLC ("Creative Capital"); (iii) G$ Trade Financial, Inc. (iv) Reverse Auto Loan, LLC; (v) The Dream Makers Capital Investments, LLC; (vi) United Investment Club, LLC; (vii) Unity Entertainment Group, Inc.; and (viii) Wealth Builders Circle, LLC.

Insolvency Period[2]; (ii) George Theodule ("Theodule") used the Receivership Entities in operating a Ponzi scheme from inception until the appointment of the Receiver; (iii) Theodule defrauded investors through the CCC Scheme[3] and the RAL Scheme and by the diversion of investor funds to Theodule personally, insiders and third parties and (iv) The Receivership Entities transferred funds to Wells Fargo via deposits, made transfers to insiders, including Theodule, and other third parties from their Wells Fargo accounts, and transferred funds among the Receivership Entities accounts at Wells Fargo (collectively, "Bennett's Opinions"). Report, P. 3-4.

Bennett's Opinions must be excluded for several reasons. First, her insolvency opinion is inconsistent and unreliable because she treats the Receivership Entities as one unit for insolvency purposes and individually for identification of alleged fraudulent transfers without disclosing a separate insolvency analysis for each entity in her Report. The Receivership Entities cannot be treated as alter-egos of one another for some purposes and separately when it is convenient for Perlman to increase his alleged damages against Wells Fargo. Moreover, as a threshold matter, Perlman cannot maintain Counts III and IV of the Perlman's Second Amended Complaint for fraudulent transfer claims pursuant to sections § 726.106, Florida Statutes without individually establishing insolvency as to each receivership entity named in paragraph 73 of the Second Amended Complaint.

Second, Bennett's purported Opinions that Theodule operated a Ponzi Scheme and defrauded investors are legal conclusions, not opinions. Moreover, by making these "Opinions," Bennett violates the very authoritative treatise that she cites in her Report which clearly states that CPAs should avoid expressing any opinions or conclusions regarding the existence or absence of fraud. Third, her Opinion regarding transfer of funds by and between

---

[2] Bennett defines "Insolvency Period" as November 2007 and all times thereafter. The first Wells Fargo account at issue in this case was not opened until March 25, 2008 and all Receivership Entity accounts at Wells Fargo were closed as of August 4, 2008.

[3] Bennett defines CCC Scheme and RAL Scheme generically as follows: "George Theodule ('Theodule') by and through the Receivership Entities and various Investment Clubs (the 'Club(s)') misappropriated funds by creating schemes (the "CCC Scheme" and the "RAL Scheme", collectively 'the Theodule Scheme') and diverting those funds to Theodule personally, to insiders and to third parties." "RAL" stands for Reverse Auto Loan LLC. Reverse Auto Loan LLC never maintained any accounts at Wells Fargo at any time, and any Opinions regarding the RAL scheme are completely irrelevant and inapplicable to Perlman's claims against Wells Fargo.

the Receivership Entities and others is unreliable and cannot properly be applied to the facts of this case because Bennett either failed to properly investigate and/or ignored information resulting in inflated calculations of Perlman's alleged damages. Moreover, her "cash in, cash out" calculations are elementary and do not require the expertise or specialized experience of an accountant. They are basic calculations that do not require any specialized training or experience. *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 1993 WL 387346, at *2 (N. D. Ill. 1993)(barring the expert's testimony under *Daubert* because simple averages "could be computed by anyone with junior high school mathematics" and as neither the expert's CPA training nor experience was required to reach the conclusion, it would not assist the jury). Additionally, her opinions are the result of predetermined conclusions and bias. As demonstrated by the numerous examples detailed in this motion, her Opinions reflect that she blindly followed the direction of Perlman, rather than performing an independent analysis. As well, her Opinions are designed only to tell Perlman's unsupportable exaggerated story of damages, particularly as it pertains to the accounts maintained at Wells Fargo, and will confuse rather than assist the jury.

Furthermore, Bennett's Opinions completely ignore and refuse to accept the Eleventh Circuit's mandate that Plaintiff's "claims are limited solely to those seeking relief based on harms to the Receivership Entities themselves when Theodule misappropriated funds that had been deposited to the credit of the Entities." *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed.Appx. 988, 992 (11th Cir. 2014). This Court has articulated that "embezzlement" damages are those "that occurred when Theodule and others embezzled the funds deposited into the Receivership Entities"..." [that] should have been used for the [entities'] stated purpose" (i.e., investing). *See* Motion to Dismiss Order, (ECF No. 52, pp. 4-5). "[I]t is clear that the Receiver does not have standing to assert claims held by the actual investors in the Ponzi scheme" *See* Motion to Dismiss Order, (ECF No. 52, pp. 4-5). In its published decision in *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1202 (11th Cir. 2003), the Eleventh Circuit articulated that the Trustee "is not the right party to pursue any damages resulting from the Ponzi scheme itself". Rather the Trustee's claims and standing were limited to the "embezzlement claim". *Id.* at 1201.

The distinction between "Ponzi scheme" damages and "embezzlement damages" is critical. *O'Halloran* involved "a vast Ponzi scheme…bilking more than 15,000 investors of an

3

estimated *$500 million.*" *Id.* at 1199. However, the "embezzlement damages", the only damages that the Trustee had standing to pursue, were limited to the *$6 million* that Gerald Payne wrongfully withdrew from the First Union accounts. *Id.* at 1201. In fact, in *O'Halloran*, the Eleventh Circuit noted that: "Lack of clarity about whether the plaintiffs were pursuing the embezzlement claim or the Ponzi claim, or both, has apparently plagued this lawsuit from the filing of the initial complaint" and "counsel for the Appellants acknowledged that it was a mistake to include in the complaint so many allegations about the underlying Ponzi scheme." *Id.* at 1201-1202.

Wells Fargo is simultaneously filing a motion in limine to exclude any testimony or evidence regarding any amounts and alleged damages unrelated to Wells Fargo Receivership Entity accounts. For purposes of brevity and to avoid repetition, Wells Fargo's arguments in this regard will be more fully addressed in its motion in limine. However, it is apparent that the inadmissible content in Bennett's Report is so intertwined with the remainder of Bennett's Report, that once the Court removes all of the inadmissible content, there is no way to salvage any remaining portions of Bennett's Report or Opinions. In the event that the Court allows Bennett to testify on *any* issues, her testimony must be limited *solely* to the "embezzlement" claims from the accounts the Receivership Entities maintained at Wells Fargo, as set forth in the Eleventh Circuit's mandate, this Court's Motion to Dismiss Order (ECF No. 52).

Accordingly, for the reasons described in this motion, the admission of Bennett's Opinions or testimony would not assist the trier of fact in this case. As such, Bennett's Opinions and testimony must be excluded.

## II. REPORTS AND DEPOSITION TESTIMONY

1. Perlman's deadline to disclose expert reports was August 18, 2014.

2. On August 18, 2014, Perlman provided Wells Fargo with the Report of Expert submitted by Sherry M. Bennett, CPA, CIRA, CFF, a copy of which is attached as Exhibit A.

3. On September 19, 2014, Wells Fargo served Perlman with the report of its forensic accountant expert, Karl Jarek, CPA ("Jarek"), which criticizes and rebuts Bennett's Report and Opinions, a copy of which is attached as Exhibit B.

4

4.      On October 30, 2014, Wells Fargo deposed Bennett regarding Bennett's Opinions.[4]

5.      As set forth below, Bennett's Opinions are either legal conclusions, or are inconsistent, unreliable, irrelevant, biased predetermined conclusions and/or simple calculations not requiring specialized training or experience. For these reasons, Bennett's testimony and Opinions should be excluded.

6.      On December 4, 2015, Jarek was deposed by Plaintiff.

7.      On January 9, 2015, after Wells Fargo had disclosed Jarek's criticism of Bennett's Opinions and Report and both Bennett and Jarek had been deposed, the Receiver filed a new Declaration of Sherry M. Bennett in Support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 161-3) ("Bennett Declaration"). The Bennett Declaration includes new opinions and calculations, not contained in the Bennett Report. Accordingly, these new opinions must be stricken because they are untimely.

## III.  ARGUMENT

### A.   Standard under Federal Rule of Evidence 702

Federal district courts serve as gatekeepers for admission of expert testimony, and must ensure that admitted testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). The admissibility of expert testimony turns on three things: whether a given expert is qualified to testify competently on the subject matter; whether the expert uses a reliable method to reach conclusions; and, whether the witness' expertise would assist the trier of fact in comprehending relevant evidence. *Quiet Tech. DC–8, Inc. v. Hurel–Dubois U.K. Ltd.,* 326 F.3d 1333, 1340-1341 (11th Cir. 2003). The following essential and distinct requirements must be satisfied before testimony is admissible: "qualification, reliability, and helpfulness." *See United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999).

---

[4] The October 30, 2014 Transcript of the Deposition of Bennett ("Bennett Deposition") is being filed simultaneously herewith.

With respect to reliability, the Court must be satisfied that the expert's reasoning "properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-593. "[I]f the witness is relying solely or primarily on experience, then the witness must explain . . . how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it." *Frazier,* 387 F. 3d at 1261. Finally, because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a court "must take care to weigh the value of such evidence against its potential to mislead or confuse" a jury. *Id.* at 1263.

### B. Bennett's "Opinions" That Theodule Defrauded Investors and Operated a Ponzi Scheme, Are Not Expert Opinions But Rather Impermissible Legal Conclusions

Courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law. *See In re Traysol Products Liability Litigation,* 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (concluding that plaintiff's expert regurgitating facts and reaching conclusory opinions based on the facts invades the province of the jury and is not a proper expert opinion); *Huff v. United States,* 273 F.2d 56, 61 (5th Cir. 1959). A legal conclusion does little more than tell the jury what result should be reached and its prejudicial impact substantially outweighs its probative value Fed. R. Evid. 403; Fed.R.Evid. 704 at Committee Notes (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony); *Hendrix v. Evenflo Co., Inc.,* 255 F.R.D. 568 (N.D.Fla. 2009). Accordingly, it has long been held that opinion testimony as to the substance of law is not a proper subject of expert testimony, as it impermissibly invades the exclusive province of the court. *See, e.g., Dahlgren v. Muldrow,* 2008 WL 186641 *5 (N.D. Fla. 2008) (expert witnesses prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct; determination of which law applies and what the law means is for the Court to decide); *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990) (expert's legal conclusion inadmissible). Facts should be presented to the jury directly and an expert that assumes the role of an advocate in the presentation of facts invades the province of the jury. *In re Traysol Products Liability Litigation,* 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010). Thus, Bennett's statements that Theodule defrauded investors and operated a Ponzi scheme are inadmissible.

6

In order to establish his theory that Theodule operated a Ponzi scheme and Theodule's underlying misconduct, Perlman must call the appropriate fact witnesses to testify about facts supporting his theory. Perlman cannot introduce those facts to the trier of fact in the form of impermissible expert opinions, especially since the facts for Bennett's Opinions are based on documents and statements that are inadmissible because of double hearsay issues.[5] Perlman cannot use Bennett as a conduit to introduce hearsay statements under the guise that she used the hearsay as the basis of her opinion. *Indus. Eng'g & Dev. v. Static Control Components, Inc.*, 2014 WL 4986482 *2-3 (M.D. Fla. Oct. 6, 2014) (expert cannot testify as to inadmissible hearsay under the guise that his opinions are based on inadmissible evidence.)

Federal Rule of Civil Procedure 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of providing expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion. *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). The jury can easily understand and discern those facts from fact witnesses and the documents, without the aid of expert testimony. The Court should therefore preclude Bennett's Opinions because they are legal conclusions, which must be presented to the trier of fact through the appropriate fact witnesses.

Moreover, Bennett's proposed Opinions that Theodule operated a Ponzi scheme and defrauded investors violate the same authoritative treatise that she cites to in her Report. *See* page 11 Report citation to Business Valuation and Forensic & Litigation Services Practice Aid 07-1, Forensic Accounting – Fraud Investigations, by the American Institute of Certified Public Accountants ("AICPA Practice Aid 07-1"). The AICPA Practice Aid clearly reiterates at least three (3) times that a CPA should avoid expressing any opinions or conclusions regarding the existence or absence of fraud.:

> The CPA should avoid making statements or expressing opinions that accuse the alleged wrongdoer of fraud or that attest to the innocence of the alleged fraudulent perpetrator. The trier of fact should reach these conclusions.

---

[5] A classic example of hearsay upon hearsay or double hearsay is where a friend of Plaintiff testifies or affirms that Plaintiff's ex-wife told Defendant something. *See Wilson v. Zellner*, 200 F. Supp.2d 1356, 1361-1362 (M.D. Fla. 2002). With respect to Bennett, an example of her use of hearsay upon hearsay appears on page 6 of the Report where she states, "Theodule targeted primarily Haitian and Haitian-American investors promising double their investment in 90 days". Bennett cannot testify as to what Theodule told investors.

7

\*\*\*

> The CPA should avoid stating any conclusion about whether fraud does or does not exist, leaving that determination to the trier of fact.

\*\*\*

> The report should avoid conclusions about the existence or absence of fraud but should relate the procedures performed and the factual findings. Assurance or guarantees of completeness should be avoided.

*See* AICPA Practice Aid 07-1, .75, .79 and .84. Thus, for this reason alone, Bennett's "Opinions" should be excluded.

### C.  Bennett's Applies Inconsistent, Unreliable and Irrelevant Methodologies

*Daubert* requires the court to ensure that expert testimony is not only relevant, but reliable. To that end, the court must undertake a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. *Loeffel Steel*, 387 F.Supp.2d at 817 (citing *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 817 (7th Cir.1993). Courts must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. *Id.* In this case, a preliminary assessment of Bennett's methodology reveals that she applies inconsistent and unreliable methodologies.

#### 1.  Bennett Inconsistently Treats Receivership Entities as Alter-Egos and as Separate Distinct Entities

Bennett treats the Receivership Entities as the alter ego of one another to reach her legal conclusion that the Receivership Entities are insolvent.[6] This is consistent with the Receiver's and Wells Fargo's position that the Receivership Entities are all one and the same. However, in order to manufacture a fraudulent transfer analysis, Bennett then takes an entirely contrary view and treats each Receivership Entity as a separate distinct entity to calculate alleged damages for Perlman's fraudulent transfer claims. She does so since the Receivership Entities must, at the very least, be distinct entities in order for a "transfer" to have occurred between them (a prima facie element of Perlman's fraudulent transfer claims) and no "transfers" can occur between the

---

[6] Perlman admits, the Receivership Entities are all one and the same, as they had no separate existence and were merely alter-egos of Theodule and each other. *See* Wells Fargo's Additional Material Facts, ¶¶ 31-32 (ECF No.168).

Receivership Entities where they had no separate existence. This inconsistent treatment of the Receivership Entities cannot be reconciled.

As the Receivership Entities are alter-egos of one another, Perlman's fraudulent transfer claims are thereby precluded by the plain and unambiguous language of Section 726.102(14), Florida Statutes. Section 726.102(14) requires a debtor to dispose of or part with an asset before a transaction results in a "transfer" that is avoidable under FUFTA. Whether the transactions referenced in Bennett's report were indeed "transfers" is dependent on the definition of transfer. A transaction is not a "transfer" unless it results in the debtor "disposing of" or "parting with" an asset. A debtor does not "dispose of" or "part with" an asset unless the debtor loses dominion and control over the asset. *See Allen v. Crawford*, 172 B.R. 365, 367 (Bankr. M.D. Fla. 1994); *Wiand v. Wells Fargo Bank, N.A.*, WL 518826 *11 (M.D. Fla. Feb. 9, 2015).

Specifically, when the Receivership Entities are alter-egos of each other, the transactions identified by Bennett cannot result in the Receivership Entities disposing of, or parting with the funds that were involved in the transactions because the Receivership Entities are one and the same and do not lose dominion and control over the assets transferred between them. Since Bennett acknowledges the Receivership Entities are alter-egos, she cannot then take a completely contrary position and treat them as separate and distinct entities to calculate and count multiple times as "damages" each time monies were transferred back and forth between the Receivership Entities' accounts. Because these inconsistencies cannot be reconciled, Bennett's methodology is fatally flawed and her Opinions regarding insolvency and her calculation of FUFTA Claims damages must be excluded.

### 2. Bennett Improperly Included Deposits in Her Ponzi Scheme Damages Without Conducting an Investigation

Bennett's calculations and the items that she includes in her "reconstruction" database demonstrate a complete disregard as to whether those proceeds represent the embezzlement or misappropriation of funds by Theodule from the Receivership Entity accounts at Wells Fargo. Therefore, Bennett's purported Opinions and calculations are vastly over inclusive and will in no way assist the trier of fact.

A prime example is that, according to Bennett, Wells Fargo is liable to Perlman for deposits of disability payments by the U.S. Government into Theodule's personal Washington Mutual Bank ("WAMU"). The amount of Theodule's disability payments to his accounts at

9

WAMU are included in Bennett's calculation of transfers to George Theodule in Exhibits D, D.1, D.2 and D.3 of her Report. Bennett also characterizes those disability payments as part of the "CCC Scheme," and includes those figures in her calculation of damages attributable to Wells Fargo to support Perlman's alleged damages for Aiding and Abetting Conversion. *See* Composite Exhibit "A" to Second Amended Complaint (ECF No. 107). Bennett failed to make any effort to assess whether these monies were even related to the alleged fraud. The more logical conclusion is that Theodule's disability income and other automatic savings deposits into his personal accounts at WAMU are not part of any Ponzi scheme and were not funds that Theodule embezzled from the Receivership Entities. Accordingly, they should not have been included in Bennett's calculation of the Receivership Entities' damages.[7]

In fact, a review of these "calculations" demonstrates that Bennett merely tracked money in and money out of the Receivership Entities and numerous other accounts that have nothing to do with this case against Wells Fargo. Bennett did so without regard as to whether these were funds that Theodule embezzled from the Receivership Entities accounts at Wells Fargo and used for purposes other than the stated purpose of the Receivership Entities. In doing so, she did not apply any expertise in accounting (or any field, except perhaps data entry), in compiling data, or preparing her so-called "reconstruction" of the accounts and alleged damages against Wells Fargo.

Bennett also characterizes and includes in her Report $14 million of transactions that flowed through the IOLTA Trust Account of the Law Offices of Gabrielle Alexis, P.A. ("Alexis Trust Account"), and not through any Wells Fargo accounts in the name of Receivership Entities. There is no basis, factual or otherwise, for Bennett to include the Alexis Trust Account funds as part of Receiver's damages claims against Wells Fargo. Perlman has not been appointed the receiver for the Law Offices of Gabrielle Alexis, P.A. and its accounts are not part of the Receivership Estate. Moreover, there is substantial evidence that is contrary to Bennett's characterizations, which Bennett disregarded. First, the Alexis Trust Account was titled "Law Offices of Gabrielle Alexis, PA Trust Account Real Estate Transactions" and Gabrielle Alexis was the sole signatory. *See* Alexis Trust Account Opening Documents and Bank Statements

---

[7] Notably, Theodule never maintained any personal accounts at Wells Fargo.

attached hereto as **Exhibit "C"**. Second, the $14 million transferred into the Alexis Trust Account and which Bennett includes in her damage calculation, was wired into the Alexis Trust Account by an entity named Crowne Gold, which is not a Receivership Entity. Without any factual support, Bennett concludes that Crowne Gold is an "investment club" and includes the Crowne Gold deposits in her calculation of damages. However, Crowne Gold is also not an investment club. It is a Nevada corporation engaged in the business of facilitating the purchase of gold from its customers. *See* pleadings in the case of *Crowne Gold, Inc., et. al. v. Evolution Market Group, Inc., et. al.* (including German Cardona) – U.S. District Court, District of Oregon (Civil No.: 08-1045-AC). Moreover, of the $14 million that was deposited into the Alexis Trust Account, at least $11 million related to a single payment on behalf of German Cardona.[8]

German Cardona previously affirmed in an affidavit (Case No. 9:08-cv-81565; 3/16/2009; DE 52-2) that $11 million of the $14 million transferred to the Alexis Account from Crowne Gold was to fund the acquisition of membership interests in a real estate development project, Regency Suites in Orlando, FL, a project totally unrelated to Theodule's purported Ponzi scheme. Gabrielle Alexis confirmed the statements set forth in German Cardona's Affidavit in her own Affidavit (Case No. 9:08-cv-81565; 3/16/2009; DE 52-2) and also affirmed that $7 million of the $11 million, was thereafter transferred to Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., as escrow agent for the closing of the purchase of the membership interests. Moreover, the transaction closed. Furthermore, Dolce Regency Suites, LLC ("Dolce"), a non-receivership entity, filed a motion for summary judgment (Case No. 9:09-cv-81224; 7/6/10; DE 21) in the fraudulent transfer litigation the Receiver brought against it. In that summary judgment motion, it provided record evidence demonstrating that the funds used to close the acquisition of the membership interest of Regency Suites I, LLC, by Dolce Regency Suites, LLC, (the "Regency Transaction") did not originate with Theodule or a Receivership Entity. Yet, Bennett imprudently includes this $14 million from the Alexis Trust Account as damages even though she cannot demonstrate that the Alexis Trust Account represents investments by any Haitian Americans in either the CCC Scheme, as she defines that term in her Report. All of this information regarding the genesis of the funds was available to the Receiver

---

[8] Affidavit of German Cardona Soler (Case No. 08-81565-CIV HURLEY/HOPKINS; D.E. 52-2)

11

and Bennett, at the time Bennett completed the Bennett Report. Bennett either failed to review or willfully ignored the pertinent information so as to increase the damages through an unsupported and unilateral classification of the funds, all as part of a Perlman's misguided effort to inflate the alleged damages against Wells Fargo by many millions.

The foregoing examples also demonstrate how the Bennett Report violates the Eleventh Circuit's mandate that Perlman's "claims are limited solely to those seeking relief based on harms to the Receivership Entities themselves when Theodule misappropriated funds that had been deposited to the credit of the Entities." *Perlman*, 559 Fed.Appx. 988, 992. Instead, at best, in including amounts regarding non-Receivership Entities and monies deposited and withdrawn from other financial institutions, it is clear that Perlman's alleged damages and Bennett's Report are impermissibly seeking a much larger category of "Ponzi scheme damages." However, binding Eleventh Circuit law and this Court have both made clear that the Receiver is not authorized to pursue such claims, as they belong solely to the investors. See *O'Halloran*, 350 F.3d at 1202 (the Trustee "is not the right party to pursue any damages resulting from the Ponzi scheme itself"); *see also* Motion to Dismiss Order, (ECF No. 52, pp. 4-5)("[I]t is clear that the Receiver does not have standing to assert claims held by the actual investors in the Ponzi scheme").

D. **Bennett's Predetermined Conclusions and Bias**

Expert testimony that ignores existing data and is based on speculation is inadmissible. *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888 at *6 (E.D. Pa. April 15, 1998). For expert testimony to be admissible, it must "assist the trier of fact." *Id.* Expert testimony that is based on speculation or unrealistic assumptions is not helpful. *Id.* The American Institute of Certified Public Accountants promulgates guidelines for accountants ("AICPA Guidelines"). The AICPA Guidelines state a common sense rule:

> The attention devoted to the appropriateness of a particular assumption should be commensurate with the likely relative impact of that assumption on the prospective results. Assumptions with greater impact should receive more attention than those with less impact.

AICPA Guideline 6.31. "[W]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *JMJ Enterprises*,

12

1998 WL 175888 at *6 (*quoting In re Paoli Railroad Yard PCB Litigation*, 35 F. 3d 717, 741-42, 748-49 (3d Cir. 1994).

In the case of *De Jager Construction, Inc. v. Scheleinger*, 938 F. Supp. 446, 455 (W.D. Mich. 1996), the court struck the plaintiff's accountant expert after a *Daubert* hearing because, in addition to mathematical mistakes, his *modus operandi* included "making unsupported assertions and projections, [] deliberately ignoring documents and figures which would strike a certified public accountant in the face, and [] picking and choosing among purported facts to maximize plaintiff's damages." After listening to the testimony of the proposed expert, the Court was convinced that the expert was "seeking to weave a story" by "selecting those portions of the available material which support his client's position, and [] deliberately ingor[ing] other portions that do not support his client's claim." *Id.* The *De Jager Construction* court reasoned that because the expert had access to documents and information wholly inconsistent with his methodology and calculation of damages but chose to ignore it, his methodology was "misleading" and "untrustworthy". *Id.* at 452.

Bennett's Opinions are no different in substance than those rejected and stricken by the *De Jager Construction* Court. Bennett's Opinions reflect that she followed the direction of Perlman, rather than performing an independent analysis. She had access to both documents and information inconsistent with her Opinions at the time she issued the Bennett Report and she ignored them. Bennett's Opinions are designed solely to tell Perlman's fairytale of damages and include sums which are clearly not recoverable. Examples already discussed above are:

- The inclusion of Theodule's "disability" income from the federal government and "automatic savings" deposits into his personal accounts at WAMU in her calculation of damages relating to Perlman's aiding and abetting conversion and misappropriation claims. Clearly, these funds belong to Theodule and had nothing to do with the alleged Ponzi scheme.

- The inclusion of all "*unknown* outflows" as part of the alleged losses being claimed against Wells Fargo to bolster the Receiver's damages calculation. Bennett cannot fully and adequately assess these "unknown" transactions, so she improperly assumes they represent a loss to the Receivership Entities and includes them in her calculations to inflate alleged damages. *See* Bennett Report, Exhibit C.1. In addition to reflecting a predetermined conclusion and

potential bias, inclusion of these "unknown" transactions also demonstrates a methodology flaw which causes Bennett's opinions and calculations to fail the benchmark of reasonable certainty.

- Bennett failed to properly investigate Crowne Gold and the Alexis Trust Account (possibly intentionally) so that she could include an additional $23 million in her calculation of the alleged Ponzi scheme damages. Although first retained by Perlman in December 2008, at her Deposition on October 30, 2014, Bennett claimed to know almost nothing about Crowne Gold. *See* Bennett Deposition, pp. 57-66). As discussed above, Bennett's assumption that Crowne Gold is an "investment club" is an inaccurate assumption which allowed her to increase her calculation of damages by $14 million. Yet, she did virtually nothing to confirm it was an investment club involved in Theodule's alleged Ponzi scheme. She failed to research Crowne Gold and ignored evidence already in the SEC Receivership case which contradicts her designation of Crowne Gold as an investment club. Specifically, although the affidavits of German Cardona and Gabrielle Alexis were on file in the Receivership Action since March, 16, 2009, Bennett admitted in her deposition that she had not seen them until the day before her deposition in this matter. Moreover, Bennett became aware that there may be issues with her classification of Crowne Gold as an investment club and inclusion of the funds as part of the CCC Scheme at least as early as July 2010 (at her deposition in the Dolce Regency adversary proceeding), if not earlier. *See* July 27, 2010 Deposition of Sherry Bennett, pp. 33-52, 58-67, 73-75, 83- 87, and 102 attached hereto as **Exhibit "D"**. Yet, Bennett took no further steps to investigate Crowne Gold thereafter. Instead, Bennett disregarded the available information and maintained her prior assumption that it was an investment club based on limited facts which she considered in a manner most favorable to Perlman. Bennett wanted to believe it was the largest "investment club" so that she could include it in her Ponzi damages. She should have performed a detailed analysis to determine whether it was an investment club and whether it was part of the alleged Ponzi scheme at issue here. Her reckless failure to do so further demonstrates that Bennett is biased and designed her investigative procedures to reach predetermined conclusions.

- Bennett failed to properly investigate and disclose her treatment of the Alexis Trust Accounts within her Report. Although Bennett only did a cursory analysis of the Alexis Trust Account and its purpose, she chose to include $11 million in transactions which passed through the Alexis Trust Account in her loss calculations. While Bennett chooses to characterize

14

the Alexis Trust Account as a Receivership Entity Account, she ignores the fact that the Law Offices of Gabrielle Alexis, P.A. was never placed in receivership and the funds in the Alexis Trust Account have never been determined to be part of the receivership's claims. Bennett cherry picked evidence to make the Alexis Trust Account look as if it was a Creative Capital bank account and completely ignored facts that demonstrate that the Alexis Trust Account is not related to the CCC Scheme of allegedly defrauding Haitian and Haitian-American investors.

Accordingly, Bennett's Opinions must be excluded based upon her inclusion of transactions in her calculation of potential damages against Wells Fargo that are unsupportable and do not rise above the level of unsupported speculation. *De Jager,* 938 F. Supp at 448; *JMJ Enterprises,* 1998 WL 17588 at *6 (E.D. Pa. April 15, 1998).

### E. Certain of Bennett's Opinions Amount to Simple Statements of Fact and Contain Calculations Not Requiring Specialized Training or Experience

Bennett's Opinions that: (1) "[t]he Receivership Entities transferred funds to WF via deposits, [m]ade transfers to insiders, including Theodule, and other third parties from their WF accounts, and transferred funds among the Receivership Entities accounts at WF" are elementary observations that require nothing more than a review of the bank records. Additionally, Bennett's Exhibits C.1, C.2, C.3, D.1, D.2 and D.3 (which the Receiver claims quantify various aiding and abetting damages), are simple calculations that do not require any expertise. *Israel Travel Advisory Service,* 1993 WL 387346, at *2.

Here, Bennett merely sorted transactions by date and then added up the transactions. In her deposition, Bennett admitted that she did not know how the Receiver planned to use these exhibits. She only knew that the Receiver asked her to perform these mathematical addition calculations. *See* Bennett Deposition, p. 197; L. 2-3; p. 199; L. 1-3; p. 204, L. 3-6. When asked why she did not quantify the "transfers" to insiders, including Theodule and other third parties from the Wells Fargo accounts, she similarly responded, "[t]he Receiver didn't ask us to quantify that amount." Bennett Deposition, p. 197, L. 18-23; p. 198, L. 12-17. Interestingly, Bennett was never asked by Perlman to calculate these amounts which represent the embezzlement damages identified by the District Court and the Eleventh Circuit as the only damages which Perlman can pursue in this case. The simple fact that Bennett has not been asked to calculate the only measure of damages that the Receiver is authorized to pursue is the reason her Report is of no aid to this Court and must be excluded.

15

Bennett's "reconstruction" merely tracks all money in and money out of the Receivership Entities,' including non-Wells Fargo accounts, accounts of Theodule personally and the Alexis Trust account (including funds belonging to Crowne Gold). She did not apply any accounting expertise or attempt to assess whether transactions were part of the Ponzi scheme or not. She assumed all transactions were part of the fraud scheme. This lack of accounting expertise applied by Bennett demonstrates that Perlman is attempting to glamorize simple calculations as some sort of legitimate forensic accounting damages calculation.

It is of limited assistance to a jury for a CPA to do simple mathematical calculations which, the Court, a reasonable juror, or lawyer could perform. *De Jager Construction Inc.*, 938 F. Supp at 449. Accordingly, if an expert proposes to testify about damages using a highly simplistic methodology, this opinion may be rejected. By example, in the case of *Israel Travel*, the court rejected plaintiff's proffer concerning average profit per customer where the CPA's method was to subtract total cost from total revenues and divide by the total number of customers. *Israel Travel* 1993 WL 387346, at *2. The subtraction and division performed in the *Israel Travel* case was even more difficult than the addition function Bennett performed and the Receiver now attempts to introduce in this case. Clearly, her Opinions should also be excluded on these bases. They are simply not expert opinions.

F. **Bennett's Untimely Declaration Should Be Stricken and/or Excluded**

In his Motion for Partial Summary Judgment (ECF No. 161), Perlman includes Bennett's Declaration. Bennett's Declaration should not be considered as it is based on work that Bennett performed well after the August 18, 2014 deadline for expert disclosures, after Wells Fargo's expert forensic accountant, Jarek served his report criticizing Bennett's report, and after both Bennett and Jarek were deposed. There can be no dispute that all the information upon which Bennett's Declaration was based was in the Receiver's and Bennett's possession long before Bennett's report was served in August 2014. In fact, Bennett testified at her deposition that all of her opinions (from 2008 through October 2014) rendered to date in the case were set forth in the Bennett Report, that they were complete and that she had not been tasked to do any further work in connection with this case. Bennett Deposition, pp. 28-29.

16

Bennett's Declaration[9] includes additional analysis in the form of spreadsheets which purport to outline the Receiver's damages pursuant to his FUFTA claims. Specifically, in her Declaration, Bennett includes an additional $1,326,652.29 in FUFTA damages for transfers made to Wachovia accounts in the name of *non-Receivership Entities*. As with her calculations in the Bennett Report, it is patent that the Receiver directed Bennett to create the additional analysis. Moreover, these additional damages calculations are not part of the Receiver's FUFTA claims set forth in the operative Second Amended Complaint and were not included in the Bennett Report or her deposition testimony. Rather, these transactions comprise an entirely new theory of damages which the Receiver has just recently raised in an eleventh-hour proposed Third Amended Complaint, which is awaiting a ruling on Plaintiff's motion for leave to amend.

To allow Bennett to expand her Opinions at this late date and try to sneak in claims and damages not framed by the pleadings and explored in discovery would be manifestly prejudicial and unfair to Wells Fargo. This is plainly inconsistent with Fed. R. Civ. P. 26 requirements and the requirements of this Court's August 18, 2014 expert disclosure deadline to which Perlman never sought relief. Accordingly, the Declaration should be stricken. *Alphamed Pharmaceuticals Corp. v. Arriva Phyamaceuticals, Inc.*, 2005 WL 5960935 *1 (S.D. Fla. August 24, 2005)(Late supplemental expert report produced after expert's deposition which raised alternative theory of damages was stricken by Court on the basis that no excusable theory was offered for the untimely disclosure)[10]; *Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821 (11th Cir. 2009)(striking expert testimony because late disclosure of the scientific basis for an expert's opinion deprived defendant of a meaningful opportunity to depose him on the subject).

**WHEREFORE**, Wells Fargo moves the Court for entry of an Order excluding and/or striking the opinion testimony of plaintiff's proposed expert Sherry Bennett, and prohibiting Plaintiff from introducing any evidence contained in her Report and/or Declaration in support of

---

[9] Plaintiff did not file a motion for leave to file an untimely amendment or supplement to his expert's report, and has not provided any explanation or excuse for the untimely disclosure. Plaintiff should not be allowed to violate the expert opinion deadlines and procedures established by this Court by characterizing new opinions as a Declaration.

[10] However, if this Court considers matters not included in Bennett's pre-deposition Report, Wells Fargo must be allowed to conduct additional discovery on these new alleged, opinions, findings and conclusions prior to trial and be given ample time thereafter to file a supplement to its expert's report or rebuttal.

17

any motion or trial of this cause, and for such other and further relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of March, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Dated: March 20, 2015

                **FOX ROTHSCHILD LLP**
                */s/ Amy S. Rubin*
                Amy S. Rubin (Florida Bar No.: 476048)
                arubin@foxrothschild.com
                Heather L. Ries (Florida Bar No.: 581933)
                hries@foxrothschild.com
                Elliot A. Hallak (Florida Bar No.: 68360)
                ehallak@foxrothschild.com
                Seth B. Burack (Florida Bar No.: 35242)
                sburack@foxrothschild.com
                222 Lakeview Avenue, Suite 700
                West Palm Beach, FL 33401
                Telephone:  561.835.9600
                Facsimile:  561.835.9602

                *Attorneys for Defendant, Wells Fargo Bank, N.A.*